IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KIRSHA BROWN-YOUNGER, Plaintiff, | ) | |
| v. | ) | Case No. 12 C 1979 |
| LULU.COM, et al., Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Issuance of this memorandum opinion and order follows a number of stillbirths. Each successive filing in the steady flow generated by pro se plaintiff Kirsha Brown-Younger ("Brown-Younger") has posed some type of problem that stimulates the need to provide a judicial response or ruling – most often critical in nature. But the conversion of this Court's dictation via Dictaphone into its final form after transcription by its secretary, followed by its own final editing, has been dramatically slowed by the current unavailability of its permanent secretary coupled with the extremely limited availability of temporary secretarial service. As a result, the several false starts have had to be merged into this opinion in an episodic fashion.

No effort has been made here to list the matters in some order of importance or to follow the chronology of Brown-Younger's submissions. But the end result of her serious abuse of the litigation process has been to cast more than a serious doubt as to her entitlement to proceed with this lawsuit. This opinion is issued sua sponte to explain why.

That said, it is logical to begin with the posture of the case vis-a-vis Lulu Press, Inc. ("Lulu", which Brown-Younger mistakenly lists in her Complaint as Lulu.com) – not just because Lulu is Brown-Younger's first-named defendant but also because her self-publication of her book of poetry through Lulu marks the origin of the claimed copyright infringements charged in this litigation. On

June 14 Brown-Younger filed a motion for entry of a default against Lulu. But what she does not acknowledge (but the court record expressly reflects) is that her then-appointed counsel had agreed to, and this Court had accordingly ordered on May 30, a brief further extension (until June 15) for Lulu to plead to the Complaint – an entirely reasonable matter of professional courtesy, although not perhaps to a litigant as combatant as Brown-Younger. Thus Lulu has in fact filed a timely response (of which more is said later) on June 15, so that the motion for default is denied.

At least as importantly, Lulu's June 15 response – a motion for dismissal or stay – includes as an exhibit the document pursuant to which Brown-Younger's self-publication of her work took place – and that document, a comprehensive Membership Agreement required of every new registrant with Lulu, includes an express agreement (part of its paragraph 16) to resolve any dispute that cannot be settled in good faith negotiation through arbitration rather than litigation, and to do so in North Carolina to boot. All that Brown-Younger says to that, in a mixed-bag June 18 filing,[1] is this:

> She claims that she does not recall reviewing nor signing a contractual agreement with Lulu.com. She also claims that she believes that this Contract was not available for review 5-6 yrs ago when she signed up for an account with lulu.com. She claims that she is sure that at the time, 5-6 yrs ago, Lulu.com website had stated "that there is no contract, and we do not market, distribute or sell your book for you, and Authors have to self-market their own book."

From that combination of a lack of recollection together with her wholly unsupported claims, she springboards into charging Lulu with having concocted a fraudulent exhibit ("a contract such as the one that Lulu fraudulently drafted, in order to defend themselves in this suit").

---

[1] That filing is captioned in this manner:

> Motion for Stay on Proceedings To Enforce Judgement [sic];
> Motion for Relief from Order;
> Motion Requesting Pre-trial Discovery

There is no reason to credit Brown-Younger's purported reply – to the contrary, the very nature of Lulu's existence is totally consistent with the kind of contractual restrictions that its exhibit portrays, applicable to everyone that makes use of its services (and not just Brown-Younger).

And that is only one nail in the coffin into which Brown-Younger appears to have buried her claim to credibility. For example, in that same June 18 filing she asks that "the proceedings should be stayed pending the results of the FBI investigation into copy right infringement, because she claims that she had filed a complaint with the Bureau."

That type of lashing out appears to typify Brown-Younger's reaction to anyone whom, or to anything that, she regards as having interfered with her self-defined goals. Thus she had earlier filed a motion for sanctions against her former counsel,[2] to which he has now filed his response. That response refutes her accusatory charges chapter and verse, reporting among other things that:

1. Lulu had telephoned him to say that just four of Brown-Younger's books had been sold (two to Brown-Younger herself) and that it had tried to communicate with Brown-Younger to send the royalties – but Brown-Younger had let her account lapse or go dormant and did not respond to e-mails.

2. Co-defendant Amazon had sent him copies of several letters that it had addressed to Brown-Younger, stating that it had never sold any copies of her book and demanding its dismissal from the action, failing which it was prepared to seek sanctions against her (including sanctions under Fed. R. Civ. P. ("Rule") 11).

3. Perhaps most significantly in light of what is presently under discussion, Brown-Younger filed charges against her appointed counsel before the ARDC a week <u>before</u> the two of them even met and spoke for the first time.

This opinion will not repeat all of counsel's recitation of, and persuasive answers to, Brown-Younger's accusations – his response should be read to appreciate its full flavor.

---

[2] Confusingly, that motion was coupled with her also seeking sanctions against still another lawyer, who was appointed to represent her in an unrelated case pending before this Court's colleague Honorable George Lindberg.

What has been said to this point is all of a piece with a single-spaced "Motion for Criminal Sanctions" that Brown-Younger filed on June 14, in which it has targeted co-defendant Apple, Inc. ("Apple," incorrectly named in the Complaint as iTunes/Apple and iBookstore). That filing also provides an insight into Brown-Younger's abuses of litigants and the litigation system as such.[3]

But before this opinion turns to the substance of that filing, a brief digression is in order. As a purely procedural matter, this Court confesses to having been delinquent in not previously insisting on Brown-Younger's compliance with the straightforward format requirements of this District Court's LR 5.2. Although this Court is disinclined to nitpick where such matters are concerned, Brown-Younger's periodic (and inconsistent) submission of single-spaced and small-type documents really cannot be tolerated – pro se parties are not held to the same standards as lawyers, but they are obligated to familiarize themselves with the requirements of local rules as well as the Federal Rules of Civil Procedure.[4] Accordingly, Brown-Younger's motion is stricken on procedural grounds, though what follows here shows its substantive flaws as well.

As for its substance, that June 14 attack on Apple by Brown-Younger provides another nail in the earlier-mentioned figurative coffin that buries her entitlement to credibility. Leave aside the fact that this Court is not in the business of issuing criminal sanctions – defining and prosecuting crimes are of course functions of the United States Attorney's office. Even apart from that, though,

---

[3] Apple had filed its Answer to the Complaint on June 13, before Brown-Younger launched her attack discussed in the text. Under the circumstances this Court will not address that filing at this time, other than to say that Apple need not supplement that filing to deal with the now stricken motion.

[4] That should certainly be expected of Brown-Younger, who is no stranger to the federal courts. This Court's extraordinarily able and courteous minute clerk's subjection to some verbal abuse by Brown-Younger stimulated her recollection of some prior history before this Court, in which Brown-Younger (then simply "Kirsha Brown") sued the FBI not once but twice (in 06 C 5336 and 08 C 484). This Court's binders, in which it retains copies of a good many of its earlier memorandum orders or opinions, reveals the dismissal of those actions based on their frivolousness. And the District Court records also include other cases launched pro se by Kirsha Brown or Kirsha Brown-Younger.

Brown-Younger is cautioned that her free use of such pejorative characterizations as "fraud, theft, and crime" and "piracy" on the part of her opponents is not risk-free conduct. Even though the laws of libel provide immunity for language used in court pleadings, unrepresented parties (like lawyers) are also subject to the obligations imposed by Rule 11(b) -- and like lawyers, unrepresented parties who violate those obligations may themselves become subject to the imposition of appropriate sanctions under Rule 11(c).

Though other examples of Brown-Younger's misconduct in this litigation could be provided, it really seems needless to go on in this vein. To go back to the point of beginning, it should be remembered that our Court of Appeals' teaching as to litigants who seek in forma pauperis status is to require not only a showing of their financial qualification for such treatment but also their assertion of some non-frivolous claim (see, e.g., Lee v. Clinton, 209 F.3d 1025, 1026 (7th Cir. 2000)). This Court's initial take on Brown-Younger's Complaint was that it met that test – indeed, that it satisfied the "plausibility" yardstick now prescribed by the Twombly-Iqbal canon. But developments since then have created a major doubt (perhaps an understatement) as to whether Brown-Younger's filings meet the test of objective good faith demanded by Rule 11(b). With Lulu having noticed up its motion for dismissal or stay to be presented at 9:15 a.m. June 27, Brown-Younger is ordered to appear at that time to answer this Court's questions on that score – questioning that she is warned may trigger the ultimate sanction of dismissal.

One final note should be sounded in that respect. This Court is of course well aware that Rule 11(b), which sets the standard of objective good faith applicable to unrepresented parties as well as lawyers, does not carry with it a specific warrant for dismissal of an action – instead the references here to Brown-Younger's violations of that Rule are included to provide one example of her misconduct in the course of this lawsuit. And this Court is equally aware that if it had known at the time of filing what it now knows, it would have denied Brown-Younger's motion for in forma pauperis treatment – but that would have called not for dismissal but only for her payment of the

$350 filing fee as the price for proceeding with her action. What has been demonstrated here instead is a litigant who has engaged in extensive impermissible conduct (including personal abuse and unwarranted charges against those whom she regards as standing in her way) – and that in abundant combination is what may well call for dismissal of her lawsuit. As stated earlier, that subject will be explored at the June 27 hearing.[5]

Milton I. Shadur
Senior United States District Judge

Date: June 19, 2012

[5] As if to underscore what was said in the first paragraph of this opinion, Brown-Younger has just delivered to this Court's chambers (even while this opinion was being edited finally to pick up a few word changes and typographical errors) a June 19 filing captioned "Motion Requesting Trial Demurrer – Opposition Response." That newest filing in reply to Lulu's motion reflects her totally unwarranted "construction" of the alternative dispute resolution provision of 28 U.S.C. § 654 as somehow invalidating the privately-agreed-upon arbitration provisions of the Federal Arbitration Act. When Alexander Pope opined that "A little learning is a dangerous thing" (Essay on Criticism pt. 2, line 15), he did not mean to negate the obvious truth that a lack of learning is likely to be even more dangerous.